# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

**DAISY P.,**[1]

       **Plaintiff,**

                        **Case No. 2:22-cv-1391**
**v.**                      **Magistrate Judge Norah McCann King**

**MARTIN O'MALLEY,**
**Commissioner of Social Security,**

       **Defendant.**

## OPINION AND ORDER

This matter comes before the Court pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), regarding the application of Plaintiff Daisy P. for Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq*. Plaintiff appeals from the final decision of the Commissioner of Social Security denying that application.[2] After careful consideration of the entire record, including the entire administrative record, the Court decides this matter pursuant to Rule 78(b) of the Federal Rules of Civil Procedure. For the reasons that follow, the Court the Court reverses the Commissioner's decision and remands the matter for further proceedings.

## I.    PROCEDURAL HISTORY

On February 21, 2018, Plaintiff filed her application for benefits, alleging that she has been disabled since January 15, 2018. R. 91, 92, 189–94. The application was denied initially

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to plaintiffs in such cases by only their first names and last initials. *See also* D.N.J. Standing Order 2021-10.

[2] Martin O'Malley, the current Commissioner of Social Security, is substituted as Defendant in his official capacity. *See* Fed. R. Civ. P. 25(d).

1

and upon reconsideration. R. 107–11, 114–16. Plaintiff sought a *de novo* hearing before an

administrative law judge ("ALJ"). R. 121. ALJ Jack Russak initially held a hearing on January

31, 2020, at which Plaintiff, who was represented by counsel, testified. R. 66–76. The ALJ also

held a second hearing on May 15, 2020, at which Plaintiff, who was again represented by

counsel, testified, as did a vocational expert. R. 32–65. In a decision dated September 22, 2020,

the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act

from February 21, 2018, Plaintiff's alleged disability onset date, through the date of that

decision. R. 15–26. That decision became final when the Appeals Council declined review on

January 18, 2022. R. 1–6. Plaintiff timely filed this appeal pursuant to 42 U.S.C. § 405(g). ECF

No. 1. On July 27, 2022, Plaintiff consented to disposition of the matter by a United States

Magistrate Judge pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil

Procedure. ECF No. 8.[3] On August 8, 2022, the case was reassigned to the undersigned. ECF No.

9. The matter is ripe for disposition.

## II.    LEGAL STANDARD

### A.    Standard of Review

In reviewing applications for Social Security disability benefits, this Court has the

authority to conduct a plenary review of legal issues decided by the ALJ. *Knepp v. Apfel*, 204

F.3d 78, 83 (3d Cir. 2000).  In contrast, the Court reviews the ALJ's factual findings to

determine if they are supported by substantial evidence. *Sykes v. Apfel*, 228 F.3d 259, 262 (3d

Cir. 2000); *see also* 42 U.S.C. §§ 405(g). The United States Supreme Court has explained this

standard as follows:

---

[3]The Commissioner has provided general consent to Magistrate Judge jurisdiction in cases
seeking review of the Commissioner's decision. *See* Standing Order In re: Social Security Pilot
Project (D.N.J. Apr. 2, 2018).

> Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficien[t] evidence to support the agency's factual determinations. And whatever the meaning of substantial in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is more than a mere scintilla. It means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (internal citations and quotation marks omitted); *see also Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation and internal quotations omitted); *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 616 (3d Cir. 2009) (citations and quotations omitted); *K.K. ex rel. K.S. v. Comm'r of Soc. Sec.*, No. 17-2309, 2018 WL 1509091, at *4 (D.N.J. Mar. 27, 2018).

The substantial evidence standard is a deferential standard, and the ALJ's decision cannot be set aside merely because the Court "acting de novo might have reached a different conclusion." *Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 812 (3d Cir. 1986); *see, e.g., Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently.") (citing *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999)); *K.K.*, 2018 WL 1509091, at *4 ("'[T]he district court ... is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact-finder.'") (quoting *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)).

Nevertheless, the Third Circuit cautions that this standard of review is not "a talismanic or self-executing formula for adjudication." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."); *see Coleman v. Comm'r of Soc. Sec.*, No. 15-6484, 2016 WL 4212102, at *3 (D.N.J. Aug. 9,

2016).  The Court has a duty to "review the evidence in its totality" and "take into account whatever in the record fairly detracts from its weight." *K.K.*, 2018 WL 1509091, at *4 (quoting *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (citations and quotations omitted)); *see Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981) (stating that substantial evidence exists only "in relationship to all the other evidence in the record"). Evidence is not substantial if "it is overwhelmed by other evidence," "really constitutes not evidence but mere conclusion," or "ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 114); *see K.K.*, 2018 WL 1509091, at *4.  The ALJ's decision thus must be set aside if it "did not take into account the entire record or failed to resolve an evidentiary conflict." *Schonewolf*, 972 F. Supp. at 284-85 (citing *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978)).

Although an ALJ is not required "to use particular language or adhere to a particular format in conducting [the] analysis," the decision must contain "sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir. 2000)); *see K.K.*, 2018 WL 1509091, at *4. The Court "need[s] from the ALJ not only an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected." *Cotter*, 642 F.2d at 705-06; *see Burnett*, 220 F.3d at 121 ("Although the ALJ may weigh the credibility of the evidence, [s/]he must give some indication of the evidence which [s/]he rejects and [the] reason(s) for discounting such evidence.") (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d. Cir. 1999)). "[T]he ALJ is not required to supply a comprehensive explanation for the rejection of evidence; in most cases, a sentence or short paragraph would probably suffice." *Cotter v. Harris*, 650 F.2d 481, 482 (3d Cir. 1981).  Absent

such articulation, the Court "cannot tell if significant probative evidence was not credited or simply ignored." *Id.* at 705. As the Third Circuit explains:

> Unless the [ALJ] has analyzed all evidence and has sufficiently explained the weight [s/]he has given to obviously probative exhibits, to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

*Gober*, 574 F.2d at 776; *see Schonewolf*, 972 F. Supp. at 284-85.

Following review of the entire record on appeal from a denial of benefits, the Court can enter "a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Remand is appropriate if the record is incomplete or if the ALJ's decision lacks adequate reasoning or contains illogical or contradictory findings. *See Burnett*, 220 F.3d at 119-20; *Podedworny v. Harris*, 745 F.2d 210, 221-22 (3d Cir. 1984). Remand is also appropriate if the ALJ's findings are not the product of a complete review which "explicitly weigh[s] all relevant, probative and available evidence" in the record. *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994) (internal quotation marks omitted); *see A.B. on Behalf of Y.F. v. Colvin*, 166 F. Supp.3d 512, 518 (D.N.J. 2016). A decision to "award benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny*, 745 F.2d at 221-22 (citation and quotation omitted); *see A.B.*, 166 F. Supp.3d at 518.

## B. Sequential Evaluation Process

The Social Security Act establishes a five-step sequential evaluation process for determining whether a plaintiff is disabled within the meaning of the statute. 20 C.F.R. § 416.920(a)(4). "The claimant bears the burden of proof at steps one through four, and the

Commissioner bears the burden of proof at step five." *Smith v. Comm'r of Soc. Sec.*, 631 F.3d

632, 634 (3d Cir. 2010) (citing *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007)).

At step one, the ALJ determines whether the plaintiff is currently engaged in substantial

gainful activity. 20 C.F.R. § 416.920(b).  If so, then the inquiry ends because the plaintiff is not

disabled.

At step two, the ALJ decides whether the plaintiff has a "severe impairment" or

combination of impairments that "significantly limits [the plaintiff's] physical or mental ability

to do basic work activities[.]" 20 C.F.R. § 416.920(c). If the plaintiff does not have a severe

impairment or combination of impairments, then the inquiry ends because the plaintiff is not

disabled.  Otherwise, the ALJ proceeds to step three.

At step three, the ALJ decides whether the plaintiff's impairment or combination of

impairments "meets" or "medically equals" the severity of an impairment in the Listing of

Impairments ("Listing") found at 20 C.F.R. § 404, Subpart P, Appendix 1. 20 C.F.R. §

416.920(d). If so, then the plaintiff is presumed to be disabled if the impairment or combination

of impairments has lasted or is expected to last for a continuous period of at least 12 months. *Id.*

at § 416.909. Otherwise, the ALJ proceeds to step four.

At step four, the ALJ must determine the plaintiff's residual functional capacity ("RFC")

and determine whether the plaintiff can perform past relevant work. 20 C.F.R. § 416.920(e), (f).

If the plaintiff can perform past relevant work, then the inquiry ends because the plaintiff is not

disabled. Otherwise, the ALJ proceeds to the final step.

At step five, the ALJ must decide whether the plaintiff, considering the plaintiff's RFC,

age, education, and work experience, can perform other jobs that exist in significant numbers in

the national economy. 20 C.F.R. § 416.920(g). If the ALJ determines that the plaintiff can do so,

then the plaintiff is not disabled. Otherwise, the plaintiff is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least twelve months.

## III.   ALJ DECISION AND APPELLATE ISSUES

Plaintiff was 49 years old on February 21, 2018, the date on which she filed her application. R. 25. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity between that date and the date of the ALJ's decision. R. 17.

At step two, the ALJ found that Plaintiff suffered from the following severe impairments: hypertension; asthma; loss of vision in the right eye; degenerative disc disease of the lumbar spine with radiculopathy; neuropathy; obesity; and schizophrenia. *Id*.

At step three, the ALJ found that Plaintiff did not suffer an impairment or combination of impairments that met or medically equaled the severity of any Listing. R. 18–19.

At step four, the ALJ found that Plaintiff had the RFC to perform light work subject to various additional limitations. R. 19–25. The ALJ also found that this RFC did not permit the performance of Plaintiff's past relevant work as a child care attendant and industrial cleaner. R. 25.

At step five and relying on the testimony of the vocational expert, the ALJ found that a significant number of jobs–*e.g.*, jobs as an inspector hand packager and an odd piece checker– existed in the national economy and could be performed by Plaintiff despite her lessened capacity. R. 25–26. The ALJ therefore concluded that Plaintiff was not disabled within the meaning of the Social Security Act from February 21, 2018, the application date, through the date of the decision. R. 26.

Plaintiff disagrees with the ALJ's findings at step four and asks that the decision of the

Commissioner be reversed and remanded with directions for the granting of benefits or, alternatively, for further proceedings. *Plaintiff's Memorandum of Law,* ECF No. 11; *Plaintiff's Reply Brief*, ECF No. 13. The Commissioner takes the position that his decision should be affirmed in its entirety because the ALJ's decision correctly applied the governing legal standards, reflected consideration of the entire record, and was supported by sufficient explanation and substantial evidence. *Defendant's Brief Pursuant to Local Civil Rule 9.1*, ECF No. 12.

## IV.     SUMMARY OF RELEVANT MEDICAL EVIDENCE

### A.     Gerard Figurelli, Ph.D.

Gerard Figurelli, Ph.D., a consultative psychological examiner, conducted a mental status evaluation of Plaintiff on March 5, 2014. R. 355–58. Dr. Figurelli noted Plaintiff's reports of previous drug use, the death of her mother and brother, her use of prescribed psychotropic medicine to help with symptoms of depression, her history of suicidal ideation and a past suicide attempt, and her history of auditory and visual hallucinations. R. 355. Upon mental status examination, Dr. Figurelli found as follows:

> [Plaintiff] identified herself as being 5 feet 4 inches tall and weighing approximately 195 pounds. At the time of this evaluation, she appeared casually dressed and not well groomed. Throughout the evaluation, she remained alert, compliant, adequately controlled and verbally responsive. During the evaluation, she avoided eye contact with the examiner.

> [Plaintiff] communicated using full sentences. Her speech remained sufficiently clear and intelligible for the examiner to understand. The content of her verbalizations in response to the examiner's questions was normally productive. It appeared that [Plaintiff] experienced no significant difficulty in her attempts to adequately comprehend or remain relevantly focused, in general, upon verbal interaction with the examiner and basic verbal instruction provided by the examiner.

> Upon formal mental status exam, [Plaintiff] *manifested no significant deficits with immediate recall. She did manifest difficulty with delayed recall, and difficulty with*

8

*the performance of relatively short, structured tasks intended to assess her capacity for sustained concentration. More specifically,* [Plaintiff] **was able to repeat in immediate recall the names of all four common objects stated to her, but was unable to repeat the names of any of these four common objects in delayed recall. When asked to perform serial fives backward and when asked to spell the word "world", she was unable to do so.** [Plaintiff] was able to repeat up to four digits forwards and three digits backward in immediate recall.

At the time of this evaluation, [Plaintiff] was fully oriented to person, place and time. She manifested no gross evidence of active psychotic disturbance (i.e. hallucinations or delusions); *however, she does report the history of auditory and visual hallucinatory-like experiences as well as the history of paranoid thoughts* that are noted above, Regarding her history with paranoid thoughts, [Plaintiff] reports that "sometimes when I walk at night I think somebody behind me". Daisy expressed herself, typically, in a goal directed manner and manifested no gross evidence of a formal thought disorder. She manifested no significant preoccupations in the content of her thoughts. [Plaintiff's] mood, at the time of this evaluation appeared depressed with affect congruent to mood.

[Plaintiff] appears to be of around borderline range intelligence. Her fund of general information appeared limited to her low level of education and restricted range of life experience. [Plaintiff] *displayed limited understanding of the nature of her emotional difficulties and the significance of her psychologically based symptoms.* [Plaintiff's] judgment, at the time of this evaluation, was adequate. She reports a history of suicidal ideation and two suicide attempts. [Plaintiff] denied any history of homicidal ideation, intent, plan or attempts. Her behavior remained, at all times, appropriate to the structure and demands of an assessment/clinical interview situation.

R. 356 (emphasis added). Dr. Figurelli also noted that Plaintiff was not currently participating in psychotherapy or psychiatric treatment and reported no prior history of involvement in outpatient mental health treatment, although she reported being hospitalized psychiatrically on two or three occasions "'for taking a bunch of pills and throwing myself down the stairs.'" *Id*. Plaintiff further reported that she completed the ninth grade and was in special education classes during the eighth grade. R. 357. Plaintiff reported that Plaintiff lived with her sister, denied any involvement in leisure time or recreational activities, denied having a valid driver's license and did not drive, but stated that she "can take public transportation independently if necessary." *Id*. According to Dr. Figurelli, Plaintiff "remains independently functional in various areas of

personal care and basic self help skills; manages her own money; and can do shopping, as well as cleaning. [She] reports that she is unable to do laundry, cooking and is unable to use the computer." *Id*. Plaintiff reported first using heroin and alcohol at 18 years of age and stated that her last use of these substances was seven months earlier. *Id*. Plaintiff also stated that she had completed a three-month inpatient substance abuse treatment in December 2013. *Id*. Dr. Figurelli assessed the severity of Plaintiff's condition as follows:

> By report, [Plaintiff] has a history of problems with depression and accompanying psychotic symptomatology. She reports last experiencing any psychotic symptoms at the time wh[en] she completed her treatment for drug abuse at Integrity. It appears that the current limitations in social and occupational functioning that [she] may experience are related to her history of substance abuse, psychiatric illness, limited formal education, limited employability skills and the mental status documented above.

R. 358. Dr. Figurelli's diagnostic impression was major depressive disorder, recurrent severe, with history of mood congruent psychotic features; opioid use disorder, early in remission; and cocaine use disorder, in early remission. *Id*. According to Dr. Figurelli, due to Plaintiff's history of substance abuse, "it appears that Daisy will require assistance in order to manage benefit funds in her own best interest at the present time if they are granted." *Id*.

**B.     Judy Inturmendi, Psy.D.**

On October 24, 2017, Judy Inturmendi, Psy.D., conducted a consultative psychological examination. R. 360–63. Dr. Inturmendi noted that Plaintiff "was a poor historian, but cooperative." R. 360. Plaintiff reported that she "attempted suicide three times and was hospitalized (2014, 2015, and 2016). She has participated in therapy or counseling in the past, but could not identify a protective factor. She rated her current emotional distress at 2/10 because of how she feels." *Id*. Plaintiff lives with a friend and is able to cook, clean the house, take care of her laundry, perform personal hygiene and self-care daily and independently, but is "unable to

10

use electronic technology to seek out and access community resources to meet her needs." *Id*.

Plaintiff reported prior alcohol and drug abuse. R. 360–61. She completed the 9th grade in a

special education program. R. 361. Upon mental status examination, Dr. Inturmendi reported the

following:

> *She was alert and oriented x 2 (person and place), but less so for time, situation, and familiar objects. She believed the day to be Wednesday, the month to be November and the season to be winter. She did not know why she was being assessed*, but seemed to think in terms of the assessment being a therapy appointment. She was able to appropriately label and state the function of two out of three familiar objects. Her affect was euthymic, but her reported mood was anxious and depressed. Her speech and thoughts were coherent and linear with no signs/behaviors suggestive of an active thought disorder, but she endorsed perceptual disturbances. She acknowledged a history of suicidal ideations and attempts by taking an overdose of pills; last time was in 2016. She denied homicidal ideations/impulses. She endorsed auditory hallucinations of one male voice telling her "nobody cares; why are you living; nobody loves you." She stated that he commands her to harm self. She insists these are not her thoughts. First time she heard the voice was in 2016 right before she attempted suicide and the last time was a week ago. She endorsed visual hallucinations in which she sometimes sees shadows. First time she saw the vision was in 2016 and the last time was a night ago. She does not believe it is due to her vision problems. She endorsed paranoia towards people in general. She endorsed thought withdrawal and insertions, as well as delusions of control.

> **Attention and concentration**
> Her level of attention and concentration was deficient as ***she was unable to spell world forward and backwards, unable to count backwards from 49 to zero by serial sevens, and unable to complete a less demanding task of counting backwards from 20 to zero by serial twos.***

> **Memory**
> *Immediate recall was adequate for recalling aurally presented numerical digits forward (5 digits), but deficient for manipulating a different set of digits and recalling them backwards (2 digits). She required redirecting a couple of times to correctly complete digits backwards. **Short-term memory, which reflects ability to learn new information, was deficient as she was unable to recall even one of the three words (Shoe, Flag, and Tree previously registered) at one minute and five minutes.** Her performance suggests she may experience serious challenges with encoding at a level that would impact her acquisition of new information.*

> Recent memory and remote memory were both intact and appropriate as she was able to recall specific information about yesterday and back to childhood. Recent

11

past memory was deficient as she was unable to recall specific information back a few months ago (including the last two calendar holidays).

**Language comprehension**

Expressive language skills were intact and appropriate as she was able to repeat five words as instructed (*No ifs, ands, or buts* [emphasis in original]). In addition, for receptive language skills she was able to read and follow a simple one-step instruction (*close your eyes* [emphasis in original]), but failed to listen and follow a multistep verbal instruction (*pick up this piece of paper, fold it in half, and place it back on the desk* [emphasis in original]).

**Fund of Knowledge**

Her fund of knowledge was intact and appropriate for information on local culture (*Name a local professional sports team from NY or NJ and any sport* [emphasis in original]), but less so for geography (*where does the president live* [emphasis in original]), well-known persons (*who was Martin Luther King, Jr. or if President Obama is the 44th president, who was the 42nd president?* [emphasis in original]), and historical events (*Why do we celebrate the 4th of July, if answered correctly ask, and from whom was independence gained* [emphasis in original]), She expressed a very vague awareness of who Martin Luther King, Jr. was, and was unable to determine the identity of the 42nd president even with the stimulus prompt provided, and responded "Hillary Clinton, Donald Trump." She was unaware of where the presidents of the U.S. live. She was unaware of why the 4th of July is celebrated, and stated, "have families come together." She was unable to solve a simple oral math problem (*How many quarters are in $1.75* [emphasis in original]) within seconds and stated she did not know.

**Abstract thinking/reasoning**

***Ms. P[.] was unable to analyze and interpret two typically known proverbs***, one (*Don't cry over spilled milk* [emphasis in original]) which measures *mature resignation and priorities* [emphasis in original], and the other (*A bird in the hand is worth two in the bush* [emphasis in original]) which measures caution, realistic hopes/plans. Her interpretation of the first proverb was vague, simplistic, based on the appearance of the stimulus, and incorrect. She did not attempt to interpret the meaning of the second proverb and stated she did not know. ***She most likely will be challenged with this aspect of abstract verbal thinking/reasoning and problem solving.***

**Judgement/insight**

Her social judgment was intact and appropriate for how to respond to a specific situation in a structured setting (*What are you supposed to do if you find a purse or wallet in a store* [emphasis in original]), but she stated she did not know how to respond to the same situation in an unstructured setting (*If you found it on the street* [emphasis in original]). She acknowledged having difficulty making decisions, such as "If I want to sleep or be around family members." ***Based on her history and current functioning, her insight and judgment are impaired.***

R. 361–62 (emphasis added unless otherwise noted). Dr. Inturmendi summarized her findings

and recommendations as follows:

> Ms. P[.]'s *mental control and functioning are seriously challenged across all areas*
> *assessed. She appears to have low intellectual functioning.* A psychological
> evaluation could more accurately identify her level of cognitive functioning and
> help guide appropriate treatment. She may benefit from individual cognitive
> behavioral therapy that focuses on coping, anxiety reducing techniques, insight and
> judgment enhancement, problem solving and cognitive restructuring. She may also
> benefit from an association with the division of vocational rehabilitation to help
> identify an appropriate training program consistent with her skills and ability. She
> may also benefit from community support through social services. *Based on her*
> *history and current mental status functioning her prognosis is guarded.*

R. 362 (emphasis added). Dr. Inturmendi opined that Plaintiff is unable to manage her own

funds. *Id*.

### C.   Joyce Echo, Ph.D.

On January 29, 2019, Joyce Echo, Ph.D., conducted a consultative psychological

examination. R. 371–75. Dr. Echo expressly noted that Plaintiff "was *cooperative* with the

examination procedures" and "was considered a *fairly reliable* informant despite cognitive

limitations." R. 371 (emphases added). Plaintiff "definitely needed some concrete structuring to

questions so she had difficulty with more open-ended questions." *Id*. (explaining further that

"when queried about psychiatric issues, she had difficulty spontaneously reporting. When again

the question was more structured, she was then able to report some issues"). Plaintiff reported

auditory hallucinations as well as a remote hospitalization for suicidality. R. 371–72. Plaintiff

endorsed mood dysregulation and reduced frustration. R. 372. Dr. Echo specifically noted that

Plaintiff "is not currently in any formal outpatient treatment other than medication management,

which is overseen by her PCP. *She reports that she is not currently in psychiatric treatment*

*because she does not like to leave the house.*" *Id*. (emphasis added). Plaintiff reported that she

13

does not drive and takes public transportation only when accompanied by someone; she can dress, bathe, and groom herself; and her friend with whom she lives does the chores and meal preparation. *Id*. Plaintiff also reported remote polysubstance abuse for which she had undergone inpatient treatment. R. 373. Plaintiff completed the 9th grade and attended a specialized school for individuals with disabilities. *Id*. She had last worked in a warehouse around 2013 or 2014, and she reported that her mood dysregulation had interfered with her work, that she had been imprisoned following a physical altercation, and that she had been fired from that job. *Id*. Because of her paranoia, she thought that everyone was against her and was talking about her. *Id*. Upon mental status examination, Dr. Echo made the following findings:

> The claimant's speech was coherent. Her thoughts were goal directed. Her speech was somewhat slowed in rate, but normal in rhythm and prosody. Her auditory comprehension was adequate for simple and concrete and routine information and notable finding was reduced comprehension on some of the mental status tasks, particularly when asked to do things backwards in the reverse order. She did not appear to understand that, so [with] some more novel tasks, she definitely has reduced comprehension. She was able to follow flow of conversation, however. Her expressive language was fairly fluent. She spoke in simple sentences, but again was fairly fluent. *Her insight and judgment were deemed to be fair*. There were no observable perceptual abnormalities over the course of the exam. Mood was notable for some mood lability at times. Overall, though her affect was limited in range. She denied current suicidal or homicidal ideation. **She definitely presented with severe cognitive deficits. She was temporally disoriented**. She reported the date to be the 29th, but she did not know the month or the year. When she was given multiple choice options for the season, she identified fall as the season rather than winter. When she was given multiple choice cues for the year 2015, 2017, 2019, but then she said it was 2018. **On memory testing, she could recall 3/3 words on immediate recall. She did not get any of the 3 words after 5 minutes.** In fact, she did not appear to recall that the task was done. She did retrieve 1 of the 3 words with multiple choice cues. *There is definitely indication of encoding deficits. Her abstract reasoning was at expected level for her.* Some concrete responses, but are not unexpected. She reported a horse and tiger are animals; piano and drum, make the same sounds; boat and automobile, ride the same; nose and tongue, are parts of the body. Fund of knowledge was limited. She reported Obama to be the current president, Bill Clinton to the be Vice President. She did not know the Governor of New Jersey. *Attention and concentration tasks were limited*. The standard tasks were limited given her rudimentary deficits in math and reading. **She could not spell "world" forwards accurately.** She spelled it Wourd. *Serial 3's or 7's was not*

*done. She did not know what 100 – 7 was or 100 – 3. On digit span, she repeated up to 5 digits forward. She did not repeat any digits backwards.* Again, this was an example of not understanding the task as to when provided with 2 numbers to say backwards, she then gave response of 2 different numbers. *Also she did not appear to understand counting backwards from 20 back to 1. When prompted to do so, she just did it forwards. When prompted to do it backwards and she was given an example of 20, 19, 18, etc., she just continued the count forward from 21 to 30. She provided the months of the year. She made 1 omission. She left out February. She could not do it backwards.* In terms of other indicators of cognitive deficits, again on a form that [was] completed ahead of time, which has some simple questions on ADLs, the claimant did indicate she had some difficulty understanding. There was some notable misspelling. She spelled friend as frind. She spelled little as litter. She spelled sister as sid. She spelled self as selpe and indicated that she went to the 9th grade.

R. 373–74 (emphasis added). Dr. Echo went on to provide the following medical source statement:

> The claimant would have significant difficulty with typical job demands for both combination of the significant mood and psychotic features as well as the cognitive deficits. *She has deficits in reading and math, which is a hindrance to conducting a lot of work-related tasks. Her auditory comprehension is functional for every simple and concrete information, but she definitely has receptive language deficits, so she would have difficulty following some instructions, especially instructions she was learning for the first time. There was memory encoding deficit. She would not be able to recall and follow through on instructions.* Again, the mood and paranoia would definitely interfere with her social relations in a job setting. ***She would not be able to complete task at a reasonable pace.*** *Her attention and concentration are also limited.* There does not appear to be indication of malingering and *the claimant is deemed in need of oversight of having her funds managed.* She did report she has some definite deficits with this. She reported, for example, she can count change from small bills, but not larger bills, so she does not do, for example, grocery shopping independently.

R. 373–74 (emphasis added). Dr. Echo diagnosed schizoaffective disorder, borderline intellectual functioning, and rule out intellectual disability. R. 375.

## V.   DISCUSSION

Plaintiff argues that substantial evidence does not support the ALJ's RFC determination because the ALJ failed to include Dr. Echo's opined mental limitations. *Plaintiff's Memorandum of Law*, ECF No. 11, pp. 14–23; *Plaintiff's Reply Brief*, ECF No. 13, pp. 1–5. For the reasons

that follow, the Court concludes that substantial evidence does not support the ALJ's RFC determination and consideration of Dr. Echo's opinion, but for reasons different than those raised by Plaintiff. *Cf. Jennings o/b/o Thomas v. Saul*, No. CV 20-1953, 2021 WL 601097, at *2-3 (E.D. Pa. Feb. 16, 2021), *reconsideration denied sub nom. Jennings o/b/o Thomas v. Saul*, No. CV 20-1953, 2021 WL 1175134 (E.D. Pa. Mar. 29, 2021) ("This unexplained mistake is a clear, reversible error that this court has addressed *sua sponte*.") (citations omitted); *McNeal v. Comm'r of Soc. Sec.*, No. CIV.A. 10-318-J, 2012 WL 1038898, at *3 (W.D. Pa. Mar. 28, 2012) ("The Court does not reach any of the issues raised by Plaintiff but finds that remand is warranted on grounds not raised by the parties.").

A claimant's RFC is the most that the claimant can do despite her limitations. 20 C.F.R. § 416.945(a)(1). At the administrative hearing stage, it is the ALJ who is charged with determining the claimant's RFC. 20 C.F.R. § 416.946(c); *see also Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) ("The ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations.") (citations omitted). When determining a claimant's RFC, the ALJ has a duty to consider all the evidence. *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999). However, the ALJ need include only "credibly established" limitations. *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005); *see also Zirnsak v. Colvin*, 777 F.3d 607, 615 (3d Cir. 2014) (stating that the ALJ has discretion to choose whether to include "a limitation [that] is supported by medical evidence, but is opposed by other evidence in the record" but "[t]his discretion is not unfettered—the ALJ cannot reject evidence of a limitation for an unsupported reason" and stating that "the ALJ also has the discretion to include a limitation that is not supported by any medical evidence if the ALJ finds the impairment otherwise credible").

16

In addition, an ALJ must evaluate all record evidence in making a disability determination. *Plummer,* 186 F.3d at 433; *Cotter,* 642 F.2d at 704. The ALJ's decision must include "a clear and satisfactory explication of the basis on which it rests" sufficient to enable a reviewing court "to perform its statutory function of judicial review." *Cotter*, 642 F.2d at 704–05. Specifically, the ALJ must discuss the evidence that supports the decision, the evidence that the ALJ rejected, and explain why the ALJ accepted some evidence but rejected other evidence. *Id*. at 705–06; *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 505–06 (3d Cir. 2009); *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001) ("Although we do not expect the ALJ to make reference to every relevant treatment note in a case . . . we do expect the ALJ, as the factfinder, to consider and evaluate the medical evidence in the record consistent with his responsibilities under the regulations and case law."). Without this explanation, "the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Cotter*, 642 F.2d at 705; *see also Burnett,* 220 F.3d at 121 (citing *Cotter*, 642 F.2d at 705).

For claims filed after March 27, 2017,[4] the Commissioner's regulations eliminated the hierarchy of medical source opinions that gave preference to treating sources. *Compare* 20 C.F.R. § 416.927 *with* 20 C.F.R. § 416.920c(a) (providing, *inter alia*, that the Commissioner will no longer "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources"). Instead, the Commissioner will consider the following factors when considering all medical opinions: (1) supportability; (2) consistency; (3) relationship with the claimant, including the length of the treating examination, the frequency of examinations, and the purpose of the treatment relationship; (4) the medical source's specialization; and (5)

---

[4] As previously noted, Plaintiff's claim was filed on February 21, 2018.

other factors, including, but not limited to, "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." 20 C.F.R. § 416.920c(c).

The regulation emphasizes that "the most important factors [that the ALJ and Commissioner] consider when [] evaluat[ing] the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* at § 416.920c(a). As to the supportability factor, the regulation provides that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id.* at § 416.920c(c)(1). As to the consistency factor, the regulation provides that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* at § 416.920c(c)(2).

The applicable regulation further requires the ALJ to articulate his "consideration of medical opinions and prior administrative medical findings" and articulate in the "determination or decision how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [the claimant's] case record." *Id.* at § 416.920c(b).

In the case presently before the Court, the ALJ determined at step four of the sequential evaluation that Plaintiff had the RFC to perform a limited range of light work:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except the claimant is limited to never push or pull with the bilateral upper extremities; never operate foot controls with the bilateral lower

18

extremities; occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds; occasionally stoop, but never balance, crouch, kneel, or crawl; never be exposed to moving machinery, unprotected heights, or driving motor vehicles; avoid concentrated exposure to heat or cold, wetness or humidity, irritants, such as fumes, odors, dust and gasses, poorly ventilated areas, or exposure to chemicals; no frequent or rapid movements of the neck; never overhead reach with the bilateral upper extremities, but frequently reach in all other directions; frequently handle, that is gross manipulation, finger, that is fine manipulation, and feel with the bilateral upper extremities; and never require binocular vision. The claimant is also limited to perform simple, routine tasks; work in a low stress environment, defined as having occasional decision making required and occasional changes in the work setting; work with occasional judgment required on the job; and only occasional interact with co-workers and supervisors, but never interact with the public.

R. 19–20. In making this determination, the ALJ considered, *inter alia*, the consultative

examinations as follows:

In March 2014, a psychological consultative examiner, Dr. Figurelli, examined the claimant. During the examination, the claimant reported her problems with depression, irritability and frustration, and auditory and visual hallucinations. The claimant would see family members or hear voices telling her to attempt suicide. (B2F, pg. 1). A mental status examination found impairments in memory and concentration, depressed mood with congruent affect, limited insight, and a borderline range of intellectual functioning. However, the claimant was able to show normal judgment, full orientation in all spheres, appropriate behavior, and normal thought process. (B2F, pg. 2). During this evaluation, the claimant had not been participating in any treatment, but reported past hospitalizations. (B2F, pg. 2). She was also able to care for herself, shop, and clean independently and stopped her drug use a few months prior to the evaluation. (B2F, pg. 3). The claimant was diagnosed with major depressive disorder with psychotic features and polysubstance abuse disorder in early remission. (B2F).

A subsequent psychiatric consultative examiner, Judy Inturmendi, Psy.D., examined the claimant in October 2017. (B3F). The claimant again denied any current treatment. (B3F, pg. 1). A mental status examination found the claimant to be confused as to why she was being assessed and did not have much orientation for time. She also had an anxious and depressed mood, showed an impaired attention, concentration, and short-term memory, and endorsed continued hallucinations. However, the claimant had only mildly impaired judgment, adequate abstract thinking, intact language comprehension and fund of knowledge, and a euthymic affect. (B3F, pgs. 2-3). The claimant also reported an ability to care for her personal hygiene, cook, clean, do laundry, and socialize with others. (B3F, pg. 1). Despite this, the claimant was still found to be seriously challenged by her impairment and was diagnosed with an unspecified intellectual disability. (B3F, pgs. 3-4).

*Likewise*, *a third psychological consultative examiner, Dr. Echo,* **also found similar mental status examination results**. The claimant had a limited ability to concentrate, pay attention, and remember, limited affect, and auditory and visual hallucinations, but also had normal thought process, adequate insight and judgment, **normal abstract thinking**, and good speech and language skills. (B5F, pgs. 3-4). The claimant again reported being able to care for her personal hygiene, but denied performing any household chores or socializing with others. (B5F, pg. 2). *She also denied receiving any psychiatric treatment again.* (B5F, pg. 2). The claimant was diagnosed with schizoaffective disorder and borderline intellectual functioning. (B5F).

Accordingly, the undersigned finds that the claimant's mental impairment would support the mental limitations in the residual functional capacity. *However, the* **claimant's lack of treatment** *and her continued ability to perform activities of daily living would* **suggest that no other limitations are necessary**.

R. 22 (emphasis added).

Dr. Figurelli opined that the claimant would have social and occupational functional limitations due to her history of substance abuse and psychiatric impairments. (B2F). This is consistent with the claimant's mood dysregulation and reported irritability with others. However, the claimant has reported an ability to take public transportation when necessary and shop. In addition, the opinion did not address the claimant's impaired memory, concentration, and insight, which would also support moderate limitations in those areas of mental functioning. (B2F; B3F). Accordingly, the undersigned finds that the residual functional capacity is more consistent with the medical record.

While the second psychological consultative examiner, Dr. Iturmendi, did not provide functional limitations in her opinion, she opined that the claimant appeared to have seriously challenged mental control and functioning. (B3F). This is supported by some of the claimant's impairments with memory, concentration, and cognitive functioning during the mental examinations, but the claimant has also reported a lack of treatment. In addition, it is inconsistent with a claimant that reported, during most evaluations and during her physical treatment, that she was capable of independently caring for herself and perform activities of daily living. (B2F; B3F; B10F).

The third consultative examiner, Dr. Echo, opined that the claimant would be unable to pay attention or concentration, recall and follow instructions, remember, or have social relationships in a job setting. (B5F). ***However, the inability to perform any tasks, as noted in the opinion, would not be supported by her own mental status examination findings. While the claimant demonstrated impairments with memory and concentration, the claimant was also able to recall all words with immediate recall, had adequate abstract thinking, and did not show***

> ***effort during concentration tasks. (B5F). Moreover, the claimant had
> demonstrated more consistent results during the other two consultative
> examinations. (B2F; B3F). As noted above, the claimant continued to deny any
> psychological treatment.*** (B5F). Accordingly, the undersigned finds that the
> residual functional capacity more consistent with the medical record.

R. 24 (emphasis added).

The ALJ's consideration of Dr. Echo's opinion raises a number of concerns in the view

of this Court. First, in finding that Dr. Echo's mental status examination findings do not support

that physician's opinion, the ALJ stated that Plaintiff "did not show effort during the

concentration tasks." R. 24. While the ALJ generally cited to Dr. Echo's opinion, he offered no

explanation for this conclusion. *Id*. And contrary to the ALJ's characterization, Dr. Echo

expressly found that Plaintiff was "cooperative with examination procedures[,]" R. 371, and she

concluded that "[t]here does not appear to be indication of malingering[,]" R. 375. Based on this

record, the ALJ relied, at least in part, on a mischaracterization of the evidence when he found

that Dr. Echo's opinion was not supported and in discounting the doctor's opined limitations. R.

24, 371, 375.

The ALJ also asserted—again without explanation—that Plaintiff had "demonstrated

more consistent results during the other two consultative examinations.[5] (B2F; B3F)." R. 24.

---

[5] The Court notes that Dr. Figurelli's consultative examination taken on March 5, 2014, and Dr.
Inturmendi's examination taken on October 24, 2017, both pre-date Plaintiff's application date of
February 21, 2018. The ALJ does not explain how Dr. Figurelli's mental status examination,
taken nearly four years prior to the application date in this case, is relevant to Plaintiff's
functioning during the relevant time period. It is true that an ALJ may consider such evidence
but that evidence is not entitled to any particular weight. *See Louis v. Comm'r Soc. Sec.*, 808 F.
App'x 114, 120 (3d Cir. 2020) (citing *Pirtle v. Astrue*, 479 F.3d 931, 934 (8th Cir. 2007); 20
C.F.R. § 416.912). Notably, some courts, including this Court, have found that opinions or
reports prepared years before the relevant time period do not reflect a claimant's condition
during that relevant time period. *See Sanchez v. Kijakazi*, No. 1:21-CV-36, 2022 WL 906046, at
*13 (M.D. Pa. Mar. 28, 2022) ("[E]ven if we considered these prior medical opinions, we note
that the opinions described Sanchez's condition in 2015 *some three years prior* to the alleged
onset of her current disability.") (emphasis added); *Harris v. Comm'r of Soc. Sec.*, No. 1:19-CV-

However, as detailed earlier in this *Opinion and Order*, the three consultative examinations reflect similar findings. For example, all three consultative examiners noted that Plaintiff could repeat words on immediate recall but was unable to name words on delayed recall. R. 356 (reflecting Dr. Figurelli's finding that Plaintiff "was able to repeat in immediate recall the names of all four common objects stated to her, but was unable to repeat the names of any of these four common objects in delayed recall"), 361 (reflecting Dr. Inturmendi's finding that Plaintiff's "[s]hort-term memory, which reflects ability to learn new information, was deficient as she was unable to recall even one of the three words (Shoe, Flag, and Tree previously registered) at one minute and five minutes"), 374 (reflecting Dr. Echo's finding "[o]n memory testing, she could recall 3/3 words on immediate recall. She did not get any of the 3 words freely after 5 minutes. In fact, she did not appear to recall that the task was done"). All three consultative examiners found that Plaintiff was unable to count backwards by serial numbers. R. 356 (reflecting Dr. Figurelli's finding that Plaintiff was unable to perform serial fives backwards), 361 (reflecting Dr. Inturmendi's finding that Plaintiff was "unable to count backwards from 49 to zero by serial sevens, and unable to complete a less  demanding task of counting backwards from 20 to zero by serial twos"), 374 (reflecting Dr. Echo's finding that "[s]erial 3's Serial 3's or 7's was not done. She did not know what 100 – 7 was or 100 – 3. On digit span, she repeated up to 5 digits forward. She did not repeat any digits backwards. Again, this was an example of not understanding the task as to when provided with 2 numbers to say backwards, she then gave response of 2 different numbers. Also she did not appear to understand counting backwards from

---

12084-NLH, 2020 WL 2214534, at *7 (D.N.J. May 7, 2020) ("The main evidence Plaintiff cites to support his contention that he meets any of the criteria for Listing 1.04 during the relevant time period, which is as of March 31, 2012, are the reports of Dr. Preis and Dr. Sable. As noted above, *those reports were prepared four years prior* to Plaintiff's alleged disability onset date and they do not reflect Plaintiff's condition as of March 31, 2012.") (emphasis added).

20 back to 1. When prompted to do so, she just did it forwards. When promoted to do it

backwards and she was given an example of 20, 19, 18, etc., she just continued the count forward

from 21 to 30"). In all three consultative examinations, Plaintiff was unable to spell the word

"world." R. 356 (reflecting Dr. Figurelli's finding that "when asked to spell the word 'world,'

she was unable to do so"), 361 (reflecting Dr. Inturmendi's finding that Plaintiff's "attention and

concentration was deficient as she was unable to spell *world* forward and backwards") (emphasis

in the original), 374 (reflecting Dr. Echo's finding that Plaintiff "could not spell 'world' forwards

accurately. She spelled it Wourd"). Both Dr. Inturmendi and Dr. Echo noted that Plaintiff was

temporally disoriented. R. 361 (reflecting Dr. Inturmendi's finding on October 26, 2017, that

Plaintiff "was alert and oriented x 2 (person and place), but less so for time, situation, and

familiar objects. She believed the day to be Wednesday, the month to be November and the

season to be winter"), 374 (reflecting Dr. Echo's finding on January 29, 2019, that Plaintiff "was

temporally disoriented. She reported the date to be the 29th, but she did not know the month or

the year. When she was given multiple choice options for the season, she identified fall as the

season rather than winter. When she was given multiple choice cues for the year 2015, 2017,

2019, but then she said it was 2018"). All three consultative examiners noted that Plaintiff had a

limited fund of knowledge. R. 356 (reflecting Dr. Figurelli's finding that Plaintiff "appears to be

of around borderline range intelligence. Her fund of general information appeared limited to her

low level of education and restricted range of life experience"), 366 (reflecting Dr. Inturmendi's

finding that Plaintiff's fund of knowledge "was intact and appropriate for information on local

culture" "but less so for geography[,] . . .well-known persons[,]. . . and historical events" and

noted that Plaintiff "was unable to determine the identity of the 42nd president even with the

stimulus prompt provided, and responded, 'Hillary Clinton, Donald Trump'"), 374 (reflecting

Dr. Echo's finding that Plaintiff's "[f]und of knowledge was limited. she reported Obama to be the current President, Bill Clinton to be the Vice President"). Notably, in contrast to his implicit finding that Dr. Echo's examination results were inconsistent or unreliable because Plaintiff demonstrated "more consistent results during the other two consultative examinations[,]" R. 24, the ALJ himself characterized Dr. Echo's mental status examination results as "similar[]" to Dr. Inturmendi's findings, R. 22. This record therefore belies the ALJ's finding that, unlike Dr. Echo's findings, the examination results of Dr. Figurelli and Dr. Inturmendi reflected "more consistent results"; moreover, the record reflects that the ALJ relied on this mischaracterization when discounting Dr. Echo's opinion.

The ALJ also stated that Dr. Echo found that Plaintiff had "adequate abstract thinking[,]" R. 24, but the psychologist actually stated instead that Plaintiff's "abstract reasoning was at expected level *for her*." R. 374 (emphasis added). Dr. Echo made this finding in the context of examination results that revealed that Plaintiff "presented with severe cognitive deficits[,]" "encoding deficits[,]" and where her "fund of knowledge was limited." R. 374; *see also* R. 362 (reflecting Dr. Inturmendi's finding that Plaintiff was "unable to analyze and interpret two typically known proverbs" and that she "will most likely be challenged with this aspect of abstract verbal thinking/reasoning and problem solving"). In other words, the Court is not persuaded that the ALJ accurately described Dr. Echo's finding regarding Plaintiff's abstract thinking as "adequate[.]" R. 24.

Substantial evidence does not support an ALJ's decision when that decision is based on a mischaracterization of the evidence. *See Sutherland v. Comm'r Soc. Sec.*, 785 F. App'x 921, 928 (3d Cir. 2019) ("[T]he ALJ still may choose whom to credit but 'cannot reject evidence for no reason or the wrong reason.'") (quoting *Morales*, 225 F.3d at 317); *cf. Cotter*, 642 F.2d at 706–

24

07 ("Since it is apparent that the ALJ cannot reject evidence for no reason or for the wrong

reason, . . . [A]n explanation from the ALJ of the reason why probative evidence has been

rejected is required so that a reviewing court can determine whether the reasons for rejection

were improper.") (internal citation omitted); *DeJesus v. Kijakazi*, No. 20-CV-06115-RAL, 2022

WL 1062914, at *10 (E.D. Pa. Apr. 8, 2022) ("By dismissing Dr. Kingry's opinion through

conclusory statements, mischaracterizations of record evidence, lay opinions, and failure to

resolve contradictory evidence, the ALJ's conclusion does not survive scrutiny even under the

less restrictive 2017 regulations. A remand is warranted."); *Murphy v. Comm'r of Soc. Sec.*, No.

1:19-CV-20122, 2020 WL 7022746, at *6 (D.N.J. Nov. 30, 2020) ("The ALJ's reliance on this

misconception, along with other unsupported mischaracterizations of Plaintiff's physical abilities

. . . permeates the ALJ's decision. As stated above, these errors cannot be separated from the

ALJ's analysis of other record evidence such that the Court may determine whether substantial

evidence supports the ALJ's RFC analysis.").

  In addition to mischaracterizing the evidence, the ALJ also selectively cited portions of

Dr. Echo's report when considering the persuasiveness of that expert's opinion. R. 24. For

example, although the ALJ acknowledged that Plaintiff "demonstrated impairments with

memory and concentration," the ALJ emphasized the fact that Plaintiff was "able to recall all

words with immediate recall[.]" R. 24. However, the psychologist also stated that Plaintiff was

unable to recall any words after only five minutes. R. 374. The ALJ also discounted Dr. Echo's

opinion because Plaintiff "continued to deny any psychological treatment. (B5F)." R. 24; *see*

*also* R. 22 ("[T]he claimant's *lack of treatment* and her continued ability to perform activities of

daily living would suggest that no other limitations are necessary.") (emphasis added). However,

the ALJ failed to acknowledge that Dr. Echo noted Plaintiff's report that "she is not currently in

psychiatric treatment *because she does not like to leave the house*." R. 372. Based on the record

in this particular case, including evidence that Plaintiff does not often leave her home and has a

limited understanding of her mental health condition, the ALJ should have at least considered

this explanation before relying on Plaintiff's lack of treatment when discounting Dr. Echo's

opinion and crafting mental limitations in the RFC determination. *See* R. 46 (reflecting

Plaintiff's hearing testimony that she stays in the house), 49 (same), 50 (same), 234 (reflecting

Plaintiff's function report statement that she does not go outside often because "I think people

follow me. I feel more safe in the house"), R. 356 (reflecting Dr. Figurelli's finding that Plaintiff

"displayed limited understanding of the nature of her emotional difficulties and the significance

of her psychologically based symptoms"), 361 (reflecting Dr. Inturmendi's finding that Plaintiff

"did not know why she was being assessed, but seemed to think in terms of the assessment being

a therapy appointment"), 693 (reflecting Plaintiff's report that she feels safe at her home), 697

(same), 697 (same), 700 (same), 705 (same), 712 (same); *see also Roberts v. Kijakazi*, No. CV

21-14-CJB, 2022 WL 17403479, at *11 (D. Del. Dec. 2, 2022) ("[A]lthough the ALJ cited to the

above-referenced positive therapeutic findings . . . , the ALJ failed to substantively discuss the

many negative clinical observations found in those same records" and, "[i]n failing to

substantively engage with the above-referenced negative clinical observations and findings, the

ALJ rendered it unclear whether she considered any such evidence when determining Roberts'

RFC (and if so, why she discounted it)"); *Quinn v. Kijakazi*, No. 3:20-CV-01698, 2022 WL

178824, at *5 (M.D. Pa. Jan. 18, 2022) ("A selective approach to the evidence does not

constitute substantial evidence upon which an ALJ may reasonably rely to deny benefits.")

(citations omitted); *Segal v. Comm'r of Soc. Sec.*, No. CV 19-8839, 2020 WL 2111229, at *6–7

(D.N.J. May 4, 2020) (remanding where "the Court finds that the ALJ nonetheless erred in his

treatment of medical evidence in the record: although the ALJ did not entirely ignore treatment

notes from Plaintiff's providers, he selectively cited portions of these notes, rather than

addressing the conflicting evidence within these records"); *Pastuch v. Comm'r of Soc. Sec.*, No.

CV 17-989, 2018 WL 2018063, at *9 (D.N.J. May 1, 2018) ("The ALJ must not ignore the

opinions of treating professionals or cherry pick evaluations, diagnostics, or opinions that

support a particular conclusion."); *DeJesus v. Colvin*, No. CIV. 14-4798, 2015 WL 4902159, at

*8 (D.N.J. Aug. 17, 2015) ("Adopting only portions of an opinion that support the ALJ's RFC

findings while failing to address those portions that contradict them . . . will not suffice as an

adequate explanation."); *cf.* SSR 16-3p ("We will not find an individual's symptoms inconsistent

with the evidence in the record on this basis without considering possible reasons he or she may

not comply with treatment or seek treatment consistent with the degree of his or her complaints. .

. . [W]e will consider and address reasons for not pursuing treatment that are pertinent to an

individual's case.").

At bottom, based on the present record, this Court cannot find that substantial evidence

supports the mental RFC where the ALJ rejected Dr. Echo's opinion based on

mischaracterizations of the evidence and selective citation to the record. *See Sutherland*, 785 F.

App'x at 928; *Morales*, 225 F.3d at 317; *Cotter*, 642 F.2d at 706–07. This Court therefore

concludes that remand of the matter for further consideration of these issues is appropriate.[6]

Moreover, remand is appropriate even if, upon further examination of Dr. Echo's opinion and the

RFC determination, the ALJ again concludes that Plaintiff is not entitled to benefits. *Cf.*

*Zuschlag v. Comm'r of Soc. Sec. Admin.*, No. 18-CV-1949, 2020 WL 5525578, at *8 (D.N.J.

---

[6] Plaintiff asserts other errors in the Commissioner's final decision. Because the Court concludes
that the matter must be remanded for further consideration of Dr. Echo's opinion and the RFC
determination, the Court does not consider those claims.

Sept. 15, 2020) ("On remand, the ALJ may reach the same conclusion, but it must be based on a proper foundation."); *Jiminez v. Comm'r of Soc. Sec.*, No. CV 19-12662, 2020 WL 5105232, at *4 (D.N.J. Aug. 28, 2020) ("Once more, the ALJ did not provide an adequate explanation that would enable meaningful review, and the Court once more cannot determine what role lay speculation played in the ALJ's rejection of this detailed functional assessment from Dr. Marks."); *Cassidy v. Colvin*, No. 2:13-1203, 2014 WL 2041734, at *10 n.3 (W.D. Pa. May 16, 2014) ("Nevertheless, that the ALJ may have misinterpreted or misunderstood Dr. Kaplan's findings with regard to Plaintiff's postural activities does not absolve her of her error. Rather, it highlights the need for an ALJ to fully explain her findings. Otherwise, the district court is left to engage in this sort of speculation about how an ALJ arrived at her decision.").

## VI.    CONCLUSION

For these reasons, the Court **REVERSES** the Commissioner's decision and **REMANDS** the matter for further proceedings consistent with this *Opinion and Order*.

The Court will issue a separate Order issuing final judgment pursuant to Sentence 4 of 42 U.S.C. § 405(g).

**IT IS SO ORDERED.**


Date:  March 19, 2024                          *s/Norah McCann King*
                                              NORAH McCANN KING
                                              UNITED STATES MAGISTRATE JUDGE